**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | | |
|---|---|---|
| **RUBY S. LEWIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:11-00905** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 40 - 433, 1381-1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 12 and 14.) and Plaintiff's Motion for Remand. (Document No. 16.)

The Plaintiff, Ruby S. Lewis (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on September 25, 2007, alleging disability as of May 15, 2007, due to "severe depression, scoliosis, left knee pops out of place bilateral carpal tunnel, pinched nerve in middle of spine, anxiety, bipolar, obsessive compulsive disorder and panic attacks." (Tr. at 9, 115-18, 119-20, 168.) The claims were denied initially and upon reconsideration. (Tr. at 70-72, 80-82, 83-85.) On October 17, 2008, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 86-87.) The hearing was held on May 20, 2010, before the Honorable William B. Russell. (Tr. at 31-56.) By decision dated July 16, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 9-25.) The ALJ's decision became the final decision of the Commissioner on October 27, 2011, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On November 15, 2011, Claimant brought

the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)[1]

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the

---

[1] Claimant filed a further applications for DIB and SSI on June 20, 2011, alleging an onset of disability date of July 16, 2010. (Document No. 17 at 1.) By decision dated September 14, 2012, ALJ Geraldine H. Page awarded Claimant benefits as of July 16, 2010. (Document No. 17, Exhibit 1.)

claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

(C) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, May 15, 2007. (Tr. at 11, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "depressive disorder, anxiety disorder, arthropathy of the left knee, and obesity," which were severe impairments. (Tr. at 11, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 12, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for light exertional level work as follows:

> [T]he [C]laimant has the residual functional capacity for heavy work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can only occasionally crawl and climb ladders, ropes, and scaffolds. Further, the [C]laimant's mental impairments and pain limit her to the performance of simple and detailed, but not complex, tasks.

(Tr. at 14, Finding No. 5.) At step four, the ALJ found that Claimant could return to her past relevant work as a customer service representative, retail salesperson, and health care worker. (Tr. at 24, Finding No. 6.) On this basis, benefits were denied. (Tr. at 24, Finding No. 7.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the

5

claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on September 6, 1977, and was 32 years old at the time of the administrative hearing, May 20, 2010. (Tr. at 115, 119.) Claimant had a high school education and one year of college, and was able to communicate in English. (Tr. 167, 173.) In the past, she worked as a customer service representative, retail sales person, and health care worker. (Tr. at 24, 52-53, 154-61, 168-69.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

6

*Bluefield Regional Medical Center*:

On March 18, 2004, Claimant presented to the emergency room at Bluefield Regional Medical Center complaining of an anxiety attack and neck pain. (Tr. at 302.) She was given a 1mg Ativan tablet and a 7.5mg Lortab tablet, and two to take with her, as well a prescription for Vistaril 25mg and Lortab 7.5mg, until she could follow up with her doctor the following week. (Id.)

*Dr. Derakhshan*:

On August 16, 2007, Claimant saw Dr. I. Derakhshan, a neurologist, who noted that Claimant had a normal mental state. (Tr. at 224.) Claimant was alert and oriented to all spheres of time, place and person, made sense during the entire interview, had good insight, and her memory function was normal. (Id.)

*Dr. Robertson*:

She began treatment with Dr. Robertson on October 31, 2007. (Tr. at 244-51.) Claimant reported difficulty sleeping, nervousness, panic attacks with an occurrence of twice per day, depression, lack of energy, that she was withdrawn, decreased appetite with a fifty pound unexplained weight loss, auditory hallucinations, mood swings, anger problems with a short fuse, and a dislike to crowds of people. (Tr. at 244.) On exam, Dr. Robertson noted that Claimant was calm, had an appropriate affect, was well groomed, and was mildly depressed with an anxious mood. (Tr. at 249, 251.) Her thought process, judgment, insight, and impulse control were intact, though she had auditory hallucinations. (Id.) Dr. Robertson diagnosed major depression disorder, recurrent, moderate; post traumatic stress disorder; and assessed a GAF of 60.[3] (Tr. at 249.) On November 13, 2007, Claimant

---

[3]   The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

reported increased panic attacks occurring three to four times per week. (Tr. at 243.) She also reported financial problems, that she cried a lot, did not go out a lot, and increased sleepiness. (Id.) Dr. Robertson continued her on Zoloft, Xanax, Seroquel, and added Geodon 40mg. (Id.) On December 18, 2007, Dr. Robertson noted that Claimant easily was irritated and blew up, that her panic attacks had increased, and that she had mood swings, but that she was sleeping fine and was "doing pretty good." (Tr. at 420.)

Dr. Robertson completed a form Medical Source Statement of Ability to Do Work-Related Activities (Mental) on February 5, 2008. (Tr. at 373-76.) Dr. Robertson opined that Claimant had mild, moderate, and marked limitations in work-related activities. (Id.) Specifically, he opined that Claimant was markedly limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work with or near others without being distracted by them, make simple work-related decisions, complete a normal workday or workweek, interact appropriately with the public and co-workers, and respond appropriately to work pressures in a usual work setting. (Tr. at 373-74.) He opined that Claimant was moderately limited in her ability to interact appropriately with supervisors, respond appropriately to changes in a routine work setting, understand and remember detailed instructions, perform at a consistent pace, perform activities within a schedule, maintain regular attendance, and be punctual. (Id.) In all other categories, Dr. Robertson assessed only mild limitations. (Id.)

Claimant continued to treat with Dr. Robertson through 2008. (Tr. at 404-18.) On January 15, 2008, Claimant reported that she continued to blow up a lot, was "sleeping okay," and continued to have panic attacks. (Tr. at 418.) Dr. Robertson noted that she was responsive to medications, discontinued her Geodon, and started her on Depakote 500mg. (Id.) Claimant had another therapy session with Ms. Dunford on January 29, 2008, and discussed anger management arising out of her

husband moving in with her sister and his harassing her by telephone. (Tr. at 417.) On February 5, 2008, Claimant reported visual hallucinations of bugs crawling up the wall and it was noted that she was unresponsive to medications, on March 4, 2008, she reported suicidal ideations at times, and on April 1, 2008, she reported auditory hallucinations consisting of humming noises from the corner of her eye and increased stress from past events. (Tr. at 410-12.) She had another therapy session on April 2, 2008 for family issues and past abuse. (Tr. at 409.) Claimant reported increased hallucinations, thoughts of paranoia, and passive suicidal ideation on April 9, 2008, and reported on May 6, 2008, that she was filing for divorce next month. (Tr. at 407-08.) It was noted that Claimant was responsive to medication but had increased agitation. (Tr. at 407.)

On August 18, 2009, Claimant reported that the medications seemed to be helping and it was noted that her mood was stable and that she was staying more calm. (Tr. at 516.) She was sleeping "pretty good." (Id.) Toward the end of 2009, her mood swings and outbursts of rage increased. (Tr. at 409-15.) By March 12, 2010, however, her mood was "pretty good," and her crying spells, and mood swings had decreased. (Tr. at 508.) Her changes in mood and behavior were associated with family and social stressors. (Tr. at 409-15.) She reported that she was not cutting herself on March 12, 2010. (Tr. at 508.) On April 5, 2010, the last treatment note of record, Dr. Robertson noted that Claimant was calm, cooperative, and had an appropriate affect and normal speech. (Tr. at 507.) Her thought processes were intact and she denied suicidal or homicidal ideation. (Id.) Dr. Robertson noted however, that Claimant had cut herself again last week in both wrists. (Id.) He assessed increased situational anxiety and depression. (Id.)

*Dr. Craft*:

On December 17, 2007, Claimant underwent a consultative examination with Dr. Gary Craft, M.D. (Tr. at 333-38.) On examination, Dr. Craft noted that Claimant was alert and cooperative. (Tr.

at 334.) He noted that Claimant was "very well oriented, related well to other people, and the gross mental status was intact. I could not detect any deterioration in personal habits." (Tr. at 335.) Dr. Craft opined that the prognosis for her mental disorder was fair. (Tr. at 336.)

_Ms. Dunford_:

Claimant met with her therapist, Donna E. Dunford, LPC, on December 20, 2007, and focused on her divorce and temper. (Tr. at 419.)

_Ms. Jarrell_:

Claimant underwent a mental status examination by Teresa E. Jarrell, M.A., a licensed psychologist, on January 9, 2008. (Tr. at 347-54.) Ms. Jarrell noted that Claimant presented a serious and motivated attitude and drove herself to the appointment, which was approximately a ten minute drive. (Tr. at 347.) Claimant reported difficulty concentrating due to neck pain and stomach problems from pain medication, noise irritability, anger problems, a dislike of being around others, social anxiety, and panic attacks. (Tr. at 347-50.) On mental status exam, Ms. Jarrell observed that Claimant was attentive and cooperative, had a satisfactorily motivated attitude, related in a polite manner, appeared mildly anxious, exhibited normal speech in rate and volume but not in spontaneity, was oriented times four, was mildly anxious and depressed, and had a restricted affect. (Tr. at 350.) Her thought process was linear and content was relevant, though she had mildly paranoid thoughts. (Id.) Claimant had auditory hallucinations and her insight was mildly deficient. (Tr at 350-51.) Her judgment was within normal limits. (Tr. at 351.) Claimant endorsed homicidal thoughts but denied specific intent or plan. (Id.) Her immediate memory was mildly deficient and her recent and remote memory were moderately deficient. (Id.) Claimant's concentration was severely deficient, her persistence was mildly deficient, and her pace was within normal limits. (Tr. at 351-52.) Her social functioning was mildly deficient. (Tr. at 352.) Ms. Jarrell diagnosed bipolar disorder II, most recent

10

episode depressed, severe with psychotic features; generalized anxiety disorder; and panic disorder without agoraphobia. (Tr. at 351.) Ms. Jarrell opined that her prognosis was guarded with treatment and poor without. (Tr. at 352.)

_Dr. Cloonan_:

On January 18, 2008, Holly Cloonan, Ph.D., completed a form Psychiatric Review Technique on which she opined that Claimant's mental impairments resulted in mild limitations of activities of daily living; moderate limitations in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation each of extended duration. (Tr. at 355-68.) Dr. Cloonan noted that Claimant's concentration and memory are moderately impaired but that she is able to drive, watch television, prepare meals, care for her child, and help her child with his homework. (Tr. at 367.) Dr. Cloonan also completed a form Mental Residual Functional Capacity Assessment on which she opined that Claimant was moderately limited in her ability to maintain attention and concentration for extended periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, and to understand, remember, and carry out detailed instructions. (Tr. at 369-72.) In all other functional categories, Dr. Cloonan found that Claimant was not limited significantly. (Id.)

_Ms. Wyatt_:

Claimant began treatment with Melinda M. Wyatt, M.S., a licensed psychologist, on June 10, 2008. (Tr. at 619-20.) Ms. Wyatt initially diagnosed bipolar disorder, anxiety disorder, and borderline traits. (Tr. at 621.) She assessed a GAF of 48.[4] (Id.) Claimant continued to see Ms. Wyatt

---

[4] A GAF of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

11

approximately once or twice a month through April 28, 2010. (Tr. at 589-621.) On May 17, 2010, Ms. Wyatt completed a form Medical Source Statement of Ability to Do Work-Related Activities (Mental), on which she opined that Claimant was markedly limited in her ability to understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors, and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. (Tr. at 623-24.) She further opined that Claimant was limited moderately in her ability to understand, remember, and carry out simple instructions. (Tr. at 623.) Ms. Wyatt noted that Claimant presented with "significant concerns with impaired judgment, impaired recent and remote recall, and impulsivity." (Id.) She also noted that Claimant had experienced "marked concerns with severe major depression and rages associated with bipolar disorder leading to hospitalization and self-mutilation as well as physical and verbal assaults on others." (Tr. at 624.)

*Dr. Binder*:

Dr. James Binder, M.D., completed a form Psychiatric Review Technique on August 29, 2008, on which he opined that Claimant's mental impairments resulted in mild limitations in activities of daily living; moderate limitations in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation each of extended duration. (Tr. at 421-34.) Dr. Binder also completed a form Mental Residual Functional Capacity Assessment on which he opined that Claimant was moderately limited in her ability to maintain attention and concentration for extended periods, interact appropriately with the general public, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 435-38.)

12

*Carilion Giles Memorial Hospital*:

On March 17, 2009, Claimant presented to the emergency room at Carilion Giles Memorial Hospital and reported that she had taken approximately twenty 450mg lithium pills one hour prior, following an argument with her boyfriend. (Tr. at 439.) After initial treatment and upon attempts to admit her, Claimant advised that she and her boyfriend had reconciled and she signed herself out of the hospital against medical advice. (Tr. at 439, 442.)

*Princeton Community Hospital*:

On February 7, 2010, Claimant was admitted to Princeton Community Hospital from the emergency room for worsening depression and increasing paranoia and auditory and visual hallucinations. (Tr. at 464-66.) On mental status exam, Claimant maintained good eye contact and presented with normal psychomotor activity, speech, memory, and cognition. (Tr. at 465.) She had an anxious affect and was tearful at times. (Id.) She denied suicidal or homicidal ideation, but reported auditory and visual hallucinations. (Id.) She had good abstract judgment and fair insight. (Id.) She was diagnosed with bipolar disorder NOS with psychosis, anxiety disorder NOS, personality disorder NOS, and was assessed a GAF of 40. (Id.) Dr. Ghassan Bizri, M.D., planned to admit her to "BMC for stabilization and medication management." (Id.)

Claimant was admitted to Princeton Community Hospital again on March 26, 2010, by Dr. Robertson. (Tr. at 585-87.) Claimant reported that her boyfriend had broken up with her for an unknown reason and she had difficulties dealing with the loneliness. (Tr. at 585.) She reported auditory hallucinations, paranoia, disturbed sleep, and lack of appetite and energy. (Id.) She had thought of hurting herself and called for treatment. (Id.) Mental status exam revealed that Claimant was depressed, subdued and constricted, and had diminished psychomotor activity. (Tr. at 586.) She was having suicidal and paranoia thoughts. (Id.) Her judgment, insight, and thought processes however,

13

all remained intact. (Id.) Dr. Robertson diagnosed bipolar disorder, most recent episode depressed with psychotic features; generalized anxiety disorder; chronic pain syndrome; and assessed a GAF of 40. (Id.) He admitted Claimant to behavioral medicine for stabilization, medication management, and further work up and change as needed. (Id.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) grouping together her mental impairments under the labels of depressive and anxiety disorders, and ignoring her bipolar disorder, panic attacks, and personality disorder; (2) finding that she can perform her past relevant semi-skilled work when he assessed a RFC limiting her to performing simple and detailed, but not complex tasks; (3) finding that she did not meet the "B" criteria for Listings 12.04 and 12.06; and (4) weighing the medical opinions. (Document No. 13 at 8-11.) The Commissioner asserts that the ALJ's decision is supported by substantial evidence and that Claimant's arguments are without merit. (Document No. 14 at 9-20.)

1. <u>Severe Impairments</u>.

Claimant first alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in labeling her severe mental impairments as depressive and anxiety disorders. (Document No. 13 at 8.) Claimant asserts that those labels are simplified and ignores her bipolar disorder "with extreme highs and lows and psychotic features involving visual and auditory hallucinations," panic attacks, and personality disorder, which the ALJ failed to address. (Id.)

In response, the Commissioner asserts that the ALJ specifically addressed Claimant's bipolar disorder, panic disorder, anxiety attacks, and mental condition as a whole in formulating Claimant's RFC, and therefore, did not commit any error at step two. (Document No. 14 at 11.) Citing <u>Lauver v. Astrue</u>, No. 08-87, 2010 WL 1404767, *4 (N.D. W.Va. March 31, 2010), the Commissioner asserts

that it is not error for the ALJ to find only one severe impairment so long as the ALJ considers the combined effect of all the impairments later in the sequential evaluation process. (Id. at 10.)

In reply, Claimant asserts that it is not enough merely to outline Claimant's medical treatment. (Document No. 15.) Rather, the ALJ must explain how he formulates his RFC. (Id. at 2.) Claimant asserts that the ALJ failed to discuss all her impairments at step two and in the RFC, and therefore, the basis of his RFC is unknown. (Id. at 1-2.) He failed to mention the weight he assigned his own psychologist, Ms. Jarrell. (Id. at 2.)

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2010). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994).

As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis. In Lauver v. Astrue, No. 08-87, 2010 WL 1404767, *4 (N.D. W.Va. March 31, 2010), the Northern District followed the approach of the Tenth Circuit that

15

there is no reversible error in an ALJ's failure to list all severe impairments at step two of the sequential analysis so long as he finds at least one severe impairment and considers all the severe impairments and the limitations imposed by them in formulating the RFC. See Oldham v. Astrue, 509 F.3d 1254, 1256 (10th Cir. 2007). The undersigned does not adopt this reasoning per se, and finds that an ALJ should in all cases identify all severe impairments at step two of the sequential analysis. Nevertheless, as explained in Lauver, the undersigned finds that the ALJ's exclusion of Claimant's bipolar disorder, panic attacks, and personality disorder as severe impairments at step two is harmless error. Contrary to Claimant's argument, the ALJ acknowledged these impairments and their limitations in discussing the treatment notes in formulating her RFC. (Tr. at 17-24.) Accordingly, the Court finds that any error the ALJ may have committed in this regard is harmless.

2. RFC and PRW.

Claimant next alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ's finding that she can perform her past relevant semi-skilled work is inconsistent with his RFC finding that limited her to performing simple and detailed, but not complex tasks. (Document No. 13 at 8-9.) Claimant asserts that the ALJ's RFC is not supported by the evidence as the two state agency consultants limited her to performing simple, basic work-like activities, and her two treating experts, Dr. Robertson and Ms. Wyatt proscribed work-prohibiting limitations. (Id. at 8.) The record therefore, did not support the ALJ's RFC finding of simple and detailed, but not complex tasks. (Id. at 9.) In response, the Commissioner asserts that it was Claimant's burden to prove at step four that she could not perform her past relevant work, not the Commissioner's burden to prove that she can. (Document No. 14 at 11.) The Commissioner asserts that Claimant's most recent past relevant work as she actually performed it included simple and detailed, but not complex tasks. (Id. at 12.) She quit her most recent job as a sales representative because she left her husband and not due

16

to a physical or mental inability to perform the job. (Id.) Therefore, Claimant has failed to meet her burden that she can no longer perform her past relevant work as she actually performed it. (Id.) The Commissioner further asserts that Claimant's health care job as she performed it did not exceed her RFC. (Id. at 13.)

Claimant's past relevant work as a sales representative and healthcare worker were semi-skilled in nature. (Tr. at 52-53.) Pursuant to the Regulations, semi-skilled work includes simple and detailed, but not complex tasks. See 20 C.F.R. §§ 404.1568(b), 416.968(b) (2010). This definition is consistent with the ALJ's RFC finding. Furthermore, Claimant asserted that she left her last job due to personal issues and not due to any physical or mental infirmity. As she last performed her job therefore, she was performing simple and detailed, but not complex tasks.

3. "B" Criteria.

Claimant further alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in finding that she did not meet the "B" criteria for Listings 12.04 and 12.06. (Document No. 13 at 9.) Claimant asserts that Dr. Robertson and Ms. Wyatt opined that her mental impairments caused significant limitations and Drs. Cloonan and Binder opined that they resulted in moderate limitations in social functioning. (Id.) Claimant also asserts that she had periods of decompensation of extended duration, which occurred after Drs. Cloonan and Binder completed their opinions. (Id.) In response, the Commissioner asserts that Claimant's hospitalizations met neither the severity nor duration requirements. (Document No. 14 at 14.) She presented to the hospital in March 2009, but refused admission. (Id.) In February 2010, she was admitted for less than two weeks. (Id.) Furthermore, she failed to present significant loss in adaptive functioning. (Id.) Finally, in March 2010, she again was admitted for less than two weeks with intact memory, cognition, judgment, insight, and intellectual functioning. (Id.) The Commissioner asserts that her activities otherwise

suggest that she did not meet the other criteria. (Id. at 14-15.)

The ALJ determined that Claimant's mental impairments resulted in mild limitations in maintaining activities of daily living and social functioning; moderate limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation each of extended duration. (Tr. at 13.) Addressing first the episodes of decompensation, the Court finds that her hospitalizations did not meet the durational requirement. Pursuant to 20 C.F.R. pt. 404,. subpt. P., app. 1, § 12.00(c)(4), repeated episodes of decompensation each of extended duration require "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." Regarding the remaining functional areas, Claimant reported that she took her son to school and helped him with his homework, prepared meals, managed her personal care, sweeps, mops, dusts, does laundry, washes dishes, goes outside daily, shops for food and clothes two or three times a week, pays bills, watches television, has cookouts, talks to people, visits friends once or twice a week, and attends church weekly. (Tr. at 135-42, 352.) She also picks up her mother from work, plays nintendo games, and plays cards. (Tr. at 433.) Drs. Cloonan and Binder opined that her conditions resulted in mild limitations of activities of daily living; moderate limitations in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation each of extended duration. (Tr. at 365, 431.) Similarly, Ms. Jarrell opined that she was mildly limited in her ability to maintain social functioning and persistence, had no limitations in maintaining pace, but was severely deficient in maintaining concentration. (Tr. at 351-52.)

The ALJ gave the opinions of Drs. Cloonan and Binder some weight, but nevertheless agreed with their assessment. Based on the reported activities of record and the opinion evidence, the Court finds that the ALJ's decision as to the "B" criteria is supported by substantial evidence of record.

4. <u>Opinion Evidence</u>.

Finally, Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in weighing the medical opinions. (Document No. 13 at 9-11.) She asserts that the ALJ rejected "the totality of each and every RFC, i.e., he selected bits and pieces and cobbled together his own RFC." (<u>Id.</u> at 9-10.) She asserts that the ALJ rejected the opinions of the State agency consultants, Drs. Cloonan and Binder, because their opinions contradicted his own. (<u>Id.</u> at 10.) She asserts that their opinions were consistent with Claimant's history and the medical records. (<u>Id.</u>) Claimant asserts that the ALJ mistakenly thought that someone on Dr. Robertson's staff completed his form opinion for the West Virginia Department of Health and Human Resources, when he completed the form. (<u>Id.</u> at 10-11.) She states that "[n]ot only did the ALJ determine the etiology of [Claimant's] mental illness, he prescribed a solution." (<u>Id.</u> at 11.) She further asserts that the ALJ proffered his medical opinion regarding Ms. Wyatt's opinion when he said that he "would expect more regular and frequent treatment." (<u>Id.</u>)

The Commissioner asserts in response that the ALJ "afforded varying weight depending on the extent to which each opinion was supported by the record." (Document No. 14 at 15.) The Commissioner asserts that in assessing the RFC, the ALJ is not required to give any one opinion controlling weight. (<u>Id.</u>) Contrary to Claimant's assertion, the ALJ did not reject completely Drs. Cloonan and Binder's opinions, but afforded them some weight. (<u>Id.</u> at 16.) Similarly, the ALJ gave only some weight to the opinion of Dr. Robertson, but not great weight because it was inconsistent with the entire record. (<u>Id.</u> at 18-19.)

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including

> opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2010). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made

by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the

21

evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2010). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The ALJ gave the opinions of Drs. Cloonan and Binder only some weight because they relied too heavily on Claimant's subjective complaints, and the ALJ determined that Claimant was only partially credible. The ALJ therefore, did not reject completely, their opinions "because they were diametrically opposed to his own finding as to [Claimant's] credibility" as Claimant contends. Despite only giving their opinions some weight, he essentially adopted their opinions as to the "B" criteria. The ALJ also assigned Dr. Robertson's opinion some weight. (Tr. at 22-23.) He noted that many of Claimant's conditions were exacerbated by situational factors as opposed to a permanent condition, and therefore, the limitations imposed by Dr. Robertson likely would improve if Claimant's situation would change. (Tr. at 23.) He also noted that Dr. Robertson also relied heavily on Claimant's subjective reports of symptoms and limitations. (Id.) Despite Dr. Robertson's severe limitations in his opinion, his treatment notes reflected essentially only signs of depression and anxiety and that she related well in all other respects. The same was true for Ms. Jarrell and Ms. Wyatt. Claimant had difficulty handling her situational issues but otherwise presented to her providers without incident. Thus, she warranted some limitations but not the severity of the limitations as prescribed by Dr. Robertson or Ms. Wyatt. Accordingly, the Court finds that the ALJ properly discounted the opinions based on the providers' heavy reliance on Claimant's subjective symptoms and limitations and that the ALJ's decision is supported by substantial evidence.

Motion for Remand.

Claimant filed a Motion for Remand, to which she attached a copy of the SSA's decision finding her disabled as of July 16, 2010. (Document No. 16.) Claimant asserts that with the exception of updates from treating sources and the inclusion of a medical expert, the evidence before ALJ Page essentially was the same as that considered by ALJ Russell. (Document No. 17 at 1-2.) Citing Albright v. Commissioner  of Social Sec. Admin., 174 F.3d 473 (4th Cir. 1999)(King, Circuit Judge), Lively

23

v. Secretary of Health & Human Serv., 820 F.2d 1391 (4th Cir. 1987), and Reichard v. Barnhart, 285 F.Supp.2d 728 (S.D. W. Va. 2003), Claimant asserts that this matter must be remanded. (Id. at 3-4.)

In response, the Commissioner contends that ALJ Page's decision is not new and material evidence, that it was based on evidence different from that considered by ALJ Russell, and that it does demonstrate that ALJ Russell's decision was not supported by the substantial evidence of the record before him. (Document No. 17 at 1.) First, the Commissioner, citing Sayre v. Astrue, 2010 WL 4919492, at *4 (S.D. W.Va. Nov. 29, 2010) (Chambers, J.), asserts that ALJ Page's decision itself is not new and material evidence as it was based on different evidence. (Id. at 3-7.) Second, the Commissioner asserts that the evidence upon which ALJ Page relied is neither new, material, nor related to the relevant time period before ALJ Russell. (Id. at 7-9.) The Commissioner notes at the outset that Claimant failed to identify any evidence that was presented to ALJ Page that met the sentence six standard regarding ALJ Russell's decision. (Id. at 7.) The Commissioner contends that perhaps the most crucial evidence for ALJ Page was Claimant's June 2011, hospitalization and subsequent opinion from Dr. Gardner that she met the listings from her hospitalization through March 21, 2012. (Id. at 8.) Her hospitalization does not relate to the time period before the ALJ, and therefore, the evidence did not meet the standards of sentence six. (Id.)

The Commissioner further asserts that ALJ Page relied upon the opinions of Ms. Wyatt and Dr. Robertson, which were presented to ALJ Russell. (Document No. 18 at 8.) Ms. Wyatt's opinion dated September 11, 2008, was considered by ALJ Page and could have been presented to ALJ Russell but was not. (Id.) The Commissioner therefore, contends that the opinion is not new. (Id.) Likewise, her opinion dated August 13, 2010, is not new or material as it restates the May 17, 2010, opinion already in the record, and therefore, is duplicative. (Id.) Accordingly, the Commissioner asserts that Claimant's Motion for Remand must be denied. (Id.)

24

In Sayre, this District Court found that a favorable subsequent SSA decision that is based on the same or substantially the same evidence as previously considered in a prior application should not be considered new evidence for purposes of remand pursuant to § 405(g). 2010 WL 4919492, *4. Nevertheless, "[a] subsequent favorable decision may be supported by evidence that is new and material under § 405(g), but the decision is not itself new and material evidence." Allen v. Commissioner of Soc. Sec., 561 F.3d 646, 653 (6th Cir. 2009). The Commissioner argues that ALJ Page's decision is not new and material, but the additional evidence considered by ALJ Page could be new and material, though the Commissioner argues that it is not. The Court finds that because ALJ Page relied on evidence in addition to that considered by ALJ Russell, the issue is one beyond the realm of Reichard. ALJ Page's decision itself therefore, pursuant to the holding in Sayre, is not new and material evidence. The additional evidence upon which ALJ Page relied in reaching her decision however, may be new and material evidence. Claimant did not identify the new and material evidence, and did not respond to that evidence and argument offered by the Commissioner.

To justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).[5]

---

[5] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in Borders provides the proper test in this circuit for remand of cases involving new evidence. This court will apply the standard set forth in Borders in accordance with the reasoning previously expressed in this district:

> The court in Wilkins v. Secretary of Dep't of Health & Human Servs., 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent Borders four-part inquiry is superseded by the standard in 42 U.S.C. 405(g). The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." However, Borders has not been expressly overruled. Further, the Supreme Court of the United States has not suggested that Borders' construction of § 405(g) is incorrect. Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent Borders inquiry.

In Borders, the Fourth Circuit held that newly discovered evidence may warrant a remand to the Commissioner if four prerequisites are met:  (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence.  Id.

Based on ALJ Page's decision and the exhibits provided by the Commissioner, ALJ Page relied upon certain medical records relating the Listings for mental impairments regarding Claimant's 2011 hospitalizations and Dr. Gardner's independent medical opinion. This evidence clearly does not relate to the period of time before the ALJ, and therefore does not meet the standards for remand. ALJ Page also relied upon opinion evidence from Ms. Wyatt and Dr. Robertson. To the extent that the opinions were considered by ALJ Russell, they are duplicative and do not meet the standard. To the extent that they were dated during the relevant period but not provided to ALJ Russell, Claimant has provided no reason why she did not provide them and therefore, the evidence does not meet the standard. To the extent that the remainder of the opinions post-date ALJ Russell's decision, the opinions do not relate to the period before him and do not meet the standard for remand. Accordingly, the Court finds that the evidence considered by ALJ Page was neither new, material, nor related to the time period before ALJ Russell. Consequently, Claimant's Motion for Remand must be denied.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order  entered this day, the

---

Brock v. Secretary, Health and Human Servs., 807 F. Supp. 1248, 1250 n.3 (S.D. W. Va. 1992) (citations omitted).

Plaintiff's Motion for Judgment on the Pleadings (Document No. 12.) is **DENIED**, the Plaintiff's Motion for Remand (Document No. 16.) is **DENIED**; Defendant's Motion for Judgment on the Pleadings (Document No. 14.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 29, 2013.

R. Clarke VanDervort
United States Magistrate Judge

27